SILBERMAN, Chief Judge.
Abel Limones, Sr., and Sanjuana Castillo, Plaintiffs below in this negligence action they filed on behalf of their teenage son Abel Limones, Jr., seek review of the final summary judgment in favor of the defendant, the School Board of Lee County.[1] This tragic case involves severe brain injury to Abel, a high school athlete. The cause of action arose when Abel collapsed on the field during a high school soccer game. When he stopped breathing and had no discernible pulse, his coach and a nurse bystander performed CPR. But Abel was not resuscitated until emergency personnel arrived and used a defibrillator.[2] Plaintiffs alleged that the School Board was negligent in failing to maintain an automated external defibrillator (AED) on or near the soccer field, to make it available for use, or in failing to actually use an AED on Abel. Plaintiffs also alleged that this negligence caused Abel to suffer severe and permanent brain damage. In the final summary judgment, the court determined that the School Board did not have a duty to make available, diagnose the need for, or use an AED and that, even if it did, the School Board was statutorily immune from an action on that basis. We affirm.
The soccer game between East Lee County High School and Riverdale High School took place at Riverdale’s soccer field on November 13, 2008. Abel, who was playing for East Lee County, abruptly collapsed on the field at about 7:40 p.m. Abel lost consciousness, stopped breathing, and had no discernible pulse within three minutes. Riverdale’s Assistant Principal called 9-1-1 at 7:43 p.m. while East Lee County’s coach, Thomas Busatta, and a *904 nurse bystander performed CPR. Coach Busatta testified that he called for an AED but no one responded. No one else, including the nurse who was helping Coach Busatta perform CPR, said they heard Coach Busatta call for an AED. Sadly, it appears that there was an AED on a golf cart that was parked near the soccer field’s end zone. The Fire Department arrived at the soccer field at 7:50 p.m. and used a defibrillator to deliver a shock to Abel’s heart with no success. Emergency Medical Service personnel arrived on the scene almost simultaneously and changed out the Fire Department’s defibrillator for their own. They delivered four additional shocks and administered a series of intravenous medications. Abel was resuscitated at 8:06 p.m., which was twenty-three minutes after the 9-1-1 call.
Plaintiffs procured an expert who submitted an affidavit ascribing Abel’s brain damage to the failure to use an AED sooner as follows:
Had an AED been provided to Thomas Busatta when he requested it and had it been used on Abel Limones, Jr. within 1 to 2 minutes of the time he became unconscious, stopped breathing, and had no pulse, Abel Limones, Jr. would not have required so many additional defi-brillations or shocks and would not have sustained the permanent and catastrophic anoxic brain injury leaving him in a near persistent vegetative state requiring life-long 24 hour care.
In accordance with this expert opinion, Plaintiffs pursued two separate negligence theories below. First, they asserted a general negligence claim against the School Board based on its common law duty to provide a reasonably safe environment for Abel. Second, they asserted a negligence claim based on the School Board’s failure to adhere to the terms of section 1006.165, Florida Statutes (2008), which governs AED requirements at certain public schools. The trial court granted summary judgment based on its conclusions that there was no common law duty to make available, diagnose the need for, or use an AED and that section 1006.165 likewise did not establish a cause of action for negligence. The trial court also concluded that, even if there was such a duty, the School Board was entitled to immunity under the Cardiac Arrest Survival Act.
These are legal questions that we review de novo. See Univ. of Fla. Bd. of Trs. v. Stone, 92 So.3d 264, 267 (Fla. 1st DCA 2012) (holding that the issue of statutory immunity from a negligence action is reviewed de novo); L.A. Fitness Int'l, LLC v. Mayer, 980 So.2d 550, 557 (Fla. 4th DCA 2008) (holding that review of a trial court’s ruling regarding the existence of a duty of care is de novo).
I. Common Law Duty
A. School Board’s Duty to Student Athletes
Florida courts generally recognize a school’s duty to adequately supervise its students, and this duty extends to athletic events. See Leahy v. Sch. Bd. of Hernando Cnty., 450 So.2d 883, 885 (Fla. 5th DCA 1984) (citing Rupp v. Bryant, 417 So.2d 658 (Fla.1982)). This common law duty arises from the idea that the school stands “ ‘partially in place of the student’s parents.’ ” Id. (quoting Rupp, 417 So.2d at 666). The school’s duties regarding athletic activities include (1) providing adequate instruction, (2) supplying appropriate equipment, (3) reasonably selecting or matching athletes, (4) properly supervising the event, and (5) utilizing appropriate post-injury efforts to protect the injury against aggravation. Id. Thus, as specifically relevant to this case, the School Board had a common law duty to use *905 appropriate post-injury efforts to protect Abel’s injury against aggravation.
Once a determination is made that a duty to use appropriate post-injury efforts exists, the court must determine the scope and extent of the duty. Cerny v. Cedar Bluffs Junior/Senior Pub. Sch., 262 Neb. 66, 628 N.W.2d 697, 703 (2001). Generally this standard is an objective “reasonably prudent person standard,” which is what a reasonably prudent person would have done under the circumstances. Id. at 703-04. But the analysis of the scope and extent of a school’s duty in a sports setting depends largely on the particular facts and the circumstances of the case. Id.
The question before this court is whether reasonably prudent post-injury efforts for Abel would have required making available, diagnosing the need for, or using an AED. Florida’s district courts have not addressed a school district’s duties in this context. But the Fourth District has concluded that a business owner does not have a common law duty to provide CPR or maintain or use an AED when a business invitee collapses while exercising at the owner’s facility. See L.A. Fitness, 980 So.2d at 559, 562.
In L.A. Fitness, a health club patron suffered cardiac arrest and collapsed during his workout. Id. at 552. An employee of the health club, who was certified in CPR, believed the patron was having a stroke or seizure. 9-1-1 was called, but CPR was not performed on the patron. Id. at 552-53. The health club did not have an AED on the premises. Id. at 555.
In determining whether the health club had a duty to perform CPR or to maintain or use an AED, the court looked to the Restatement of Torts. Id. at 557. The Restatement provides “ ‘that a proprietor is under an ordinary duty of care to render aid to an invitee after he knows or has reason to know the invitee is ill or injured.’” Id. (quoting Restatement (Second) of Torts § 314A (1965)). The Restatement described this duty as requiring a proprietor to “ ‘give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained.’ ” Id. (quoting Restatement (Second) of Torts § 314A cmt. f (1965)).
The Fourth District noted that courts from other jurisdictions have uniformly refused to extend a business owner’s duty from calling for medical assistance within a reasonable amount of time to providing “medical care or medical rescue services” which included services like using an AED, applying oxygen, or intubation. See L.A. Fitness, 980 So.2d at 558-59 (and cases cited therein). And the court analogized performing CPR to the use of the Heimlich maneuver, which courts in other jurisdictions have held was not included in a business owner’s duty to render aid to invitees. See id. at 559-60 (and cases cited therein).
For further guidance, the Fourth District looked to a Connecticut case in which the court examined the American Red Cross and American Heart Association’s Guidelines for First Aid. Id. at 559 (citing Pacello v. Wyndam Int’l, 41 Conn. L. Rptr. 193 (Conn.Super.Ct.2006)). Based on the absence of CPR from those guidelines, the court concluded that CPR is something more than first aid. The court explained that, while CPR is “widely known” and “relatively simple,” it nonetheless requires training and re-certification. Id. Thus, while CPR is routine for emergency medical responders, “non-medical employees certified in CPR remain laymen and should have discretion in deciding when to utilize the procedure.” Id. The court applied this rationale to the mainte *906 nance and use of an AED as well. Id. at 561-62.
We are unable to distinguish L.A. Fitness and the cases cited therein in a manner that would support finding a common law duty on behalf of the School Board in this case. The fact that a school stands partially in the place of parents does not create a duty on the school to itself provide medical care or rescue such as through the use of an AED. Also, although the sources of the legal duty are different for school boards and business owners, the circumstances under which the AEDs would be provided and used are strikingly similar. Thus, we conclude that under the current state of the law, the School Board had no common law duty to make available, diagnose the need for, or use an AED on Abel. But we caution that the existence of a duty to utilize appropriate post-injury efforts is not necessarily the same for all high school sports or athletes and is definitely not a stagnant proposition. As one commentator has aptly noted, “It may also not be enough for school districts-to assume that what may have been acceptable in the past will continue to be acceptable in the future. The law surrounding the duty to provide prompt medical [care] is still evolving.” John P. Lenich, J.D., One Strike and You’re Out: An Overview of Negligence and High School Athletics, 40 Ed. Law Rep. 1, 31 (1987).
B. Undertaker’s Doctrine
Plaintiffs alternatively argue that the School Board undertook a duty to safeguard Abel by acquiring an AED and training personnel in its use and that it failed to safeguard him by not using the AED. “It is clearly established that one who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care.” Union Park Mem’l Chapel v. Hutt, 670 So.2d 64, 66-67 (Fla.1996). This doctrine, which is commonly referred to as the “undertaker’s doctrine,”[3] is codified in the Restatement of Torts as follows:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other’s person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other’s reliance upon the undertaking.
Restatement (Second) of Torts § 323 (1965).
However, Plaintiffs have failed to establish that the School Board’s action in acquiring the AED and training personnel in its use compelled the School Board to ensure that the AED would be used in these circumstances. And Plaintiffs failed to show that the School Board’s acquisition of the AED and its training procedures either increased the risk of harm to Abel or caused Abel to rely upon such acquisition or training to his detriment. See Rotolo v. San Jose Sports & Entm’t, LLC, 151 Cal.App.4th 307, 59 Cal.Rptr.3d 770, 792 (2007) (rejecting application of undertaker’s doctrine to create a duty to make an AED available and/or use it on a teenage hockey player based on a hockey arena’s installation of an AED therein). Thus, the undertaker’s doctrine is inapplicable.
II. Duty Under Section 1006.165
Section 1006.165, Florida Statutes (2008), governs AED requirements at pub- *907 lie schools that are part of the Florida High School Athletic Association (FHSAA), such as Riverdale and East Lee County. That section provides as follows:
(1) Each public school that is a member of the Florida High School Athletic Association must have an operational automated external defibrillator on the school grounds. Public and private partnerships are encouraged to cover the cost associated with the purchase and placement of the defibrillator and training in the use of the defibrillator.
(2) Each school must ensure that all employees or volunteers who are reasonably expected to use the device obtain appropriate training, including completion of a course in cardiopulmonary resuscitation or a basic first aid course that includes cardiopulmonary resuscitation training, and demonstrated proficiency in the use of an automated external defibrillator.
(3) The location of each automated external defibrillator must be registered with a local emergency medical services medical director.
(4) The use of automated external defibrillators by employees and volunteers is covered under s. 768.13 and 768.1325.
§ 1006.165. There are no reported eases citing this statute, but its terms are very succinct. The only requirements that subsections (1) through (3) impose are to have an operational AED on school grounds, to register its location, and to provide appropriate training. We decline to decide today whether subsections (1) through (3) create a private cause of action for negligence because there is no question that the School Board complied with these requirements.
The body of section 1006.165 does not set forth requirements regarding the school’s use of the AED it is required to maintain. Instead, subsection (4) provides that the “use” of AEDs in FHSAA high schools is governed by sections 768.13 and 768.1325. We therefore look to these sections to determine whether the School Board had a duty to make available, diagnose the need for, or use an AED in the circumstances of this case.
III. Duty Under Sections 768.13 and 768.1325
Section 768.13, Florida Statutes (2008), is known as the “Good Samaritan Act.” § 768.13(1). This statute provides immunity from civil liability to any person “who gratuitously and in good faith renders emergency care or treatment” under certain circumstances in emergency situations outside a hospital or doctor’s office. See § 768.13(2)(a). To qualify for such immunity,, the person rendering aid must have done so without objection by the patient and must have “act[ed] as an ordinary reasonably prudent person would have acted under the same or similar circumstances.” Id. This immunity extends to both acts and omissions and includes diagnosis. § 768.13(2)(b)2. While this provision requires a person who undertakes a duty to render aid to do so reasonably, this provision does not set forth a duty to render aid. See L.A. Fitness, 980 So.2d at 561 n. 2.
Section 768.1325, Florida Statutes (2008), is known as the “Cardiac Arrest Survival Act.” § 768.1325(1). This statute provides immunity from civil liability for those who use or attempt to use an AED and for “any person who acquired the device and makes it available for use.” See § 768.1325(3). Immunity applies provided that harm from the use or attempted use is.not attributable to the person’s (1) failure to maintain and test the AED or (2) failure to provide any appropriate training in the use of the AED. Id. And there are certain other exceptions to immunity that *908 are not at issue given the facts alleged in this case. § 768.1325(4).
As with the immunity provision in section 768.13, section 768.1325 does not create a legal duty to render aid through the use of an AED. While immunity in subsection (3) extends to those who acquire an AED and “make[ ] it available for use,” the statute does not require the use of an AED in a given situation. Cf. Atcovitz v. Gulph Mills Tennis Club, Inc., 571 Pa. 580, 812 A.2d 1218, 1224 (2002) (“Simply, the existence of a civil immunity provision for Good Samaritans who use an AED in an emergency situation cannot impose a duty on a business establishment to acquire, maintain, and use such a device on its premises.”).
Furthermore, in order for a statute to set forth a private cause of action, the legislature must have clearly set forth such an intent therein. Murthy v. N. SinHa Corp., 644 So.2d 983, 985-86 (Fla.1994) (“In general, a statute that does not purport to establish civil liability but merely makes provision to secure the safety or welfare of the public as an entity, will not be construed as establishing a civil liability.” (quoting Moyant v. Beattie, 561 So,2d 1319, 1320 (Fla. 4th DCA 1990))); see also Miulli v. Fla. High Sch. Athletic Ass’n, 998 So.2d 1155, 1157 (Fla. 2d DCA 2008) (holding that statute which requires FHSAA to adopt bylaws that require students to pass a medical evaluation prior to participating in high school sports does not create a private cause of action). In fact, section 768.1325(5) expressly declares that it “does not establish any cause of action.”
IV. Immunity Under the Cardiac Arrest Survival Act
As discussed previously, this statute provides immunity from civil liability for “any person who acquired the device and makes it available for use.” § 768.1325(3). Plaintiffs assert that the School Board is not entitled to immunity under this statute because the School Board is not a “person” as contemplated by the Cardiac Arrest Survival Act and did not make the AED available for use in this case. We reject the first argument and conclude that the School Board qualifies as a “person” under this statute. See § 1.01(3), Fla. Stat. (2008) (“The word ‘person’ includes individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations”). As to Plaintiffs’ second argument, the School Board made the AED available for use by having it in the end zone of the soccer field. The fact that bystanders did not hear or respond to Coach Busatta’s call for an AED does not eliminate the School Board’s immunity under the statute.
V. Conclusion
In conclusion, the School Board’s common law duty to use appropriate post-injury efforts to protect Abel’s injury against aggravation did not include a duty to maintain, make available, or use an AED. And the School Board did not voluntarily undertake the duty to use an AED by acquiring one and providing training on its use as required by section 1006.165. Furthermore, section 1006.165 does not require the School Board to do anything more than have an operational AED on school grounds, register its location, and provide appropriate training. And neither the Good Samaritan Act nor the Cardiac Arrest Survival Act sets forth a duty to use an AED. Finally, even if there had been such a duty, the School Board would have been entitled to immunity from civil liability under the Cardiac Arrest Survival Act because under the terms of that Act, it acquired an AED and made it available for *909 use by having it in the end zone of the soccer field. We therefore affirm the final summary judgment entered by the trial court in favor of the School Board.
Affirmed.
CASANUEVA and BLACK, JJ„ Concur.

. Although Plaintiffs named both the School District of Lee County and the School Board of Lee County as defendants, the trial court and opposing counsel only recognized the School Board of Lee County as a proper defendant. On appeal, Plaintiffs concede that the School Board of Lee County is the proper defendant and adopt the trial court's position in its final summary judgment order that the School District of Lee County, to the extent it may exist, is an “a/k/a” of the School Board of Lee County.

. The emergency responders who first arrived used a "semi-automatic defibrillator,” not an automated external defibrillator, or AED.

. See Wallace v. Dean, 3 So.3d 1035, 1052 (Fla.2009).